# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0219V

|  |  |
|---|---|
| IGNACIO MONTES,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: September 10, 2025 |

*William I. Goldsmith, Goldsmith & Hull, APC, Northridge, CA,* for Petitioner.

*Alexis B. Babcock, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION DISMISSING PETITION[1]

On February 27, 2020, Ignacio Montes filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he received an influenza ("flu") vaccine on March 1, 2017, resulting in Guillain-Barré syndrome ("GBS"), corresponding to a listing on the Vaccine Injury Table, 42 C.F.R.§§ 100.3(a), (c)(15). Petition (ECF No. 1). The case was assigned to the Special Processing Unit ("SPU"). For the following reasons, I conclude that Petitioner has not carried his burden to prove that he received the alleged vaccine – and his entire claim must be dismissed as a result.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Procedural History**

During the initial status conference held in June 2020, Respondent questioned whether proof of vaccination could be substantiated. (ECF No. 17). Afterwards, Petitioner received over a year to obtain evidence to support this vital claim element. *See generally* Ex. 8-14, and Supplemental Statement of Completion filed Nov. 5, 2021 (ECF No. 32). Despite my suggestion, Petitioner did not file a health insurance explanation of benefits ("EOB") for the relevant time, which would have shown whether or not the alleged vaccination had been billed. *See* Scheduling Order entered Apr. 20, 2021 (ECF No. 24). Afterwards, the parties briefed the issue. Respondent's ("Resp.") Brief filed Feb. 15, 2022 (ECF No. 34); Petitioner's ("Pet.") Response filed Mar. 14, 2022 (ECF No. 36); Order to Show Cause entered Apr. 12, 2023 (ECF No. 41);[3] Pet. Supplemental ("Supp.") Response filed May 25, 2023 (ECF No. 42).[4] The matter is ripe for adjudication.

II. **Parties' Arguments**

Respondent disputes that Petitioner received a flu vaccine - either on the date alleged in the Petition (March 1, 2017), or on any other date. Resp. Brief at 8. According to Respondent, Petitioner's citation generally to Exhibit 3 does not indicate that he *actually received* a flu vaccine – and Petitioner had provided no other information regarding the surrounding circumstances "including how he recalled receiving the vaccine in his left arm." *Id.* "In fact, Petitioner had a history of refusing vaccinations, including the flu vaccine, on multiple occasions *prior to* his alleged March 2017 vaccination, so it is unclear why Petitioner would have chosen to receive one in March 2017." *Id.*

Respondent also argues that the only supportive evidence – including the 2021 copy of the state immunization record – reflects medical providers' recordation of "Petitioner's word alone," rather than any other individual's independent knowledge or any corroboration that he actually received the alleged flu vaccine. Resp. Brief at 8-9.

Petitioner argues that he had an adverse reaction to a flu vaccine previously in 2013. Petition (ECF No. 1) at ¶ 5; Pet. Supp. Response (ECF No. 41) at 4.[5] But Petitioner maintains that a treater "talked him into" receiving the flu vaccine in 2017, and that alleged

---

[3] An earlier Order to Show Cause entered Mar. 4, 2022 (ECF No. 35) primarily discussed Petitioner's "non-compliance with court orders and deadlines throughout the pendency of the case."

[4] Petitioner also filed a neurologist's expert report (ECF No. 42-1) reacting to my preliminary analysis that the record might support an alternative explanation for his GBS (ECF No. 41 at 6).

[5] Petitioner's Supplemental Response (ECF No. 41) effectively repeats and expands upon arguments raised in his first Response (ECF No. 36).

vaccination is supported by the treater's vaccine *order*, and the inclusion of informational materials about the vaccine within his Kaiser Permanente chart. *Id.* at 3-4.

Petitioner further contends that he honestly reported a recent vaccination to his medical providers during his subsequent hospitalization for GBS; that the providers accepted that history as explaining his GBS; and that the providers therefore "discontinued" all orders for flu vaccines – including the *past order* entered by the prior treater. Pet. Supp. Response at 2-3. According to Petitioner, the "discontinued" wording does not establish an actual refusal or failure to administer the vaccine that had been previously ordered. *Id.* He also maintains that Kaiser Permanente should be faulted for the delayed production and/or inconsistency in the medical records. *Id.* at 4-7. And he argues that a state immunization record printed in late 2017 was inaccurate, because it contained *several omissions* – of the at-issue alleged flu vaccine in March 2017, a concurrent Tdap vaccine, a Tdap vaccine in 2015, and a flu vaccine in 2013. Pet. Supp. Response at 4.

## III. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the

patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

As a threshold matter, to be eligible for the Vaccine Program, a potential claimant bears the burden to prove receipt of a vaccine set forth in the Vaccine Injury Table, by a preponderance of the evidence. Section 11(c)(1)(A). The special master must weigh the evidence and render a factual finding as to whether or not an alleged vaccination has been adequately established. *Hinton v. Sec'y of Health & Hum. Servs.*, 2025 WL 763153 at *2 (Fed. Cir. 2025); *Rogers v. Sec'y of Health & Hum. Servs.*, 2024 WL 2064614, at *2 (Fed. Cir. 2024).

Evidence has found to be insufficient in cases involving inconsistencies related to Petitioner's vaccination status and the events surrounding vaccination. For instance in *Rogers*, the special master dismissed a claim in which contemporaneous records reflected "that the flu vaccine was deferred on February 14, 2022" and "the order for the

4

flu vaccine was discontinued on February 15, 2022." Thus, there was "[N]o record affirmatively indicating that [the decedent] was administered the flu vaccine. Moreover, the record indicates that the vaccine was not administered… Accordingly, the evidence shows that [the decedent] did not receive the alleged flu vaccine." *Rogers,* No. 22-510V, 2023 WL 4637147, at *2-3 (Fed. Cl. Spec. Mstr. Apr. 11, 2023), *mot. for rev. den'd*,[6] *aff'd*, 2024 WL 2064614, at *2-3 (Fed. Cir. 2024); *see also Gordon v. Sec'y of Health & Hum. Servs.,* No. 18-40V, 2019 WL 4165318 (Fed. Cl. Spec. Mstr. July 29, 2019) (also involving contemporaneous medical records stating that a vaccine's order was "discontinued").

## IV. Evidence

### A. Medical Records

At the time of the alleged vaccination, Petitioner was 54 years old. Records from the Benacare Medical Center dating from April 2013 – July 2014 list his health insurance as "Blue Cross UMG," but do not also include his immunization status or any allergies. *See generally* Ex. 10; *but see id.* at 21-22 (June 2014 patient questionnaire, on which Petitioner did not report any past vaccinations, against flu or other diseases) (in Spanish).

Some time in March 2015, Petitioner joined the Kaiser Permanente health insurance plan and managed care consortium. Ex. 4 at 85. His medical appointments generally were at the Fontana Medical Center in California. Kaiser Permanente records from 2015 reflect providers' *orders* for flu and Tdap vaccines, but Petitioner's *refusal* of the same. *See e.g., id.* at 136, 149, 164, 248, 355. However in 2015-16, Petitioner underwent multiple procedures to treat longstanding eye issues related to uveitis,[7] and he underwent penicillin injections (in his gluteal muscles) and testing related to a previously-contracted infectious disease. *See e.g., id.* at 77-624.

In early 2017, a Kaiser Permanent ophthalmologist assessed Petitioner's complaints of bilateral eye redness, blurriness, burning, and pain as representing recurrent uveitis. Ex. 4 at 625-66. At the ophthalmologist's request, Kaiser Permanente infectious disease specialist Jea Hyun Lee, M.D., conducted one evaluation of Petitioner on March 1, 2017. Ex. 4 at 662, 682-95. Dr. Lee focused on Petitioner's uveitis – for which he authorized IV penicillin. *Id.* at 682-98. But Dr. Lee also assessed: "Z23 Vaccination for

---

[6] The Court of Federal Claims' opinion denying the Rogers petitioner's motion for review is not publicly available.

[7] Uveitis is "an inflammation of part or all of the uvea, commonly involving the other tunics of the eye (sclera, cornea, and retinal)." Dorland's Med. Dictionary Online (hereinafter "Dorland's"), *Uveitis*, https://www.dorlandsonline.com/dorland/definition?id=52355&searchterm=uveitis (last accessed Sept. 8, 2025).

5

Influenza. Z23 Vaccination for Diphtheria, Tetanus and Acellular Pertussis. Z12.11 Screening for Colon Cancer." *Id.* at 685. The appointment record includes a copy of patient instructions for the suggested flu vaccine (but not the additionally suggested Tdap vaccine). *Id.* at 688-691.

However, Dr. Lee did not formally *order* the flu and Tdap vaccines, and the colon cancer screening, until six days later – on March 7, 2017. Ex. 4 at 687. That entry coincided with Dr. Lee's telephone call with Petitioner to review results of a lumbar puncture[8] he had undergone earlier that same day (March 7th). *Id.* at 663-66, 702. Dr. Lee recorded Petitioner's consent to insertion of a peripherally inserted central catheter ("PICC")[9] to facilitate a 14-day course of IV penicillin. *Id.* at 702. Two days later, on March 9, 2017, the PICC line was placed in Petitioner's "left medial upper arm." *Id.* at 706.

On March 16, 2017, while at the infusion center Petitioner reported tingling in his hands and feet and back pain "since recent procedure." Ex. 4 at 712. An internal medicine provider raised concern for a peripheral neuropathy. *Id.* at 716-20.

Afterwards from March 17-27, 2017, Petitioner was hospitalized at Kaiser Permanente Fontana Medical Center, where he was diagnosed with GBS and treated with IVIg. Ex. 4 at 743-72 (discharge summary). Initially, Petitioner reported his preexisting conditions including uveitis, as well as his recent lumbar puncture and antibiotic treatments, but not any recent vaccines/vaccinations. *Id.* at 733, 772, 779, 818-819.

On March 18, 2017, at about 5:00 a.m., internal medicine physician William Lai, M.D. evaluated Petitioner and ordered a flu vaccine for him. Ex. 4 at 773-78, 1228. But afterwards, three different nurses recorded Petitioner's refusal because: "he already received vaccine," "was given the flu vaccine 3/7/2017," and "GOT THE FLU VACCINE TWO WEEKS AGO." *Id.* at 1228.

---

[8] A lumbar puncture is "the withdrawal of fluid from the subarachnoid space in the lumbar region, usually between the third and fourth lumbar vertebrae, for diagnostic or therapeutic purposes." Dorland's, *Lumbar Puncture*, https://www.dorlandsonline.com/dorland/definition?id=101105&searchterm=lumbar+puncture (last accessed Sept. 8, 2025).

[9] A peripherally inserted central catheter ("PICC") is "a long catheter introduced through a vein in the arm, then through the subclavian vein into the superior vena cava or right atrium to administer parenteral fluids (as in hyperalimentation) or medication, or to measure central venous pressure." Dorland's, *Peripherally Inserted Central Catheter*, https://www.dorlandsonline.com/dorland/definition?id=63721 (last accessed Sept. 8, 2025).

On March 21, 2017, a hospital neurologist treating Petitioner for GBS noted that he "had [a] flu shot 2 weeks ago." Ex. 4 at 835. Later that same day, internal medicine physician Vicki Trang Thu, M.D. recorded an assessment of "Guillain Barre syndrome – recent flu shot". *Id.* at 840. That notation is carried forward in subsequent records and is included in the March 27, 2017 hospital discharge summary. *Id.* at 851, 866, 875, 887, 899, 908, 916, 744.

Similarly, during a March 29, 2017 telephone call with a hospital social worker, Petitioner's wife stated that a flu vaccine had "triggered" his GBS, and the "medical team should have known the flu vaccine was detrimental to him." *Id.* at 1288.[10] Petitioner also reported his past receipt of a flu vaccine during his inpatient rehabilitation in March-April 2017 (*see, e.g.*, Ex. 5 at 3, 153, 195, 207-08) and upon starting outpatient physical therapy in May 2017 (Ex. 6 at 7). And in May 2017, a neurologist who had treated Petitioner during his hospitalization for GBS recorded: "No flu shot in the future." Ex. 4 at 823, 1320.

In contrast, an April 21, 2017 record from Petitioner's established primary care physician at Kaiser Permanente, Michael Muljana, M.D., provides: "Flu immunization due – declined today. Tdap immunization per patient given outside Kaiser 2013." Ex. 4 at 1307. This report likely informed a state immunization record listing only one immunization: "TDAP… 01/01/2013 TDAP (Adacel) [per] historical records." Ex. 2 at 1 (printed by Kaiser Permanente in November 2017).

Also of note, Dr. Lee was consulted during Petitioner's acute GBS hospitalization – but there is no indication that Dr. Lee endorsed Petitioner's report of receiving a flu vaccine. Ex. 4 at 750, 1278. And on June 6, 2017, a nurse "discontinue[d]" Dr. Lee's previous orders for the flu vaccine, Tdap vaccine, and colon cancer screening. *Id.* at 687.[11]

Petitioner also "[r]eport[ed] that he developed Guillain-Barre after receiving a flu shot in 3/2017" upon establishing with a new PCP in February 2019. Ex. 7 at 19. At this time, he had a Blue Cross health insurance plan (rather than Kaiser Permanente). *Id.*

---

[10] There is no evidence that Petitioner's wife was present at any relevant medical encounters *prior to* his hospitalization for GBS. *See generally* Ex. 4 at 656-710.

[11] *See also* Ex. 4 at 1351 (August 2017 ophthalmology assessment that Petitioner's "vision improved after IV PCN [penicillin] therapy x 2 weeks in 3/2017" – implying that no further treatments or infectious disease consults were warranted).

7

Over two years later (and after Respondent had questioned proof of vaccination), in October 2021, Kaiser Permanente produced a *new* copy of Petitioner's state immunization record – now reflecting a second entry: "Influenza, INF… 03/01/2017 INF Unspecified [per] historical records." *Compare* Ex. 2 at 1 (2017 copy) with Ex. 14 at 1 (2021 copy). Kaiser Permanente also continued to list Petitioner's PCP as Dr. Muljana, despite his transfer to another physician outside of their network. *Id.*

### B. Later Testimony

Mr. Montes has submitted one statement under penalty of perjury, in February 2020. ECF No. 1-3; *see also* 28 U.S.C. § 1746 (providing that such a statement may be given "like force and effect" as a notarized affidavit). In it, he alleges "receiv[ing] the influenza vaccination at Kaiser Permanente Fontana Medical Center… on March 1, 2017, in the intramuscular left deltoid." ECF No. 1-3 at ¶ 8. He also recounts his GBS onset and treatment beginning on March 17, 2017, *id.* at ¶ 9, and his condition before and after that time. Petitioner does not further describe the circumstances of this alleged vaccination – or any other pattern or practice towards receiving vaccines more generally.

### V. Analysis

Petitioner bears the burden of preponderantly establishing his receipt of a flu vaccine prior to his GBS onset in March 2017. He has not done so, on the record presented.

The first significant obstacle to proving vaccination in this case is Petitioner's preexisting *avoidance* of vaccines generally. Resp. Brief at 8; *see, e.g.*, Ex. 10 at 21-22; Ex. 4 at 136, 149, 164, 248, 355. His own pleadings admit that he was hesitant to receive the flu vaccine in particular, after an alleged adverse reaction in 2013. Petition (ECF No. 1) at ¶ 5; Pet. Supp. Response. Against that backdrop, it is difficult to understand why Petitioner would have *accepted* a flu vaccine – especially from Dr. Lee, a provider he was apparently meeting for the first time. Petitioner has not explained this alleged departure from his own previous pattern and practice, except in his *briefing* completed six years after the fact, which argues very briefly that Dr. Lee "talked him into it." Pet. Supp. Response at 4.

Second, Respondent persuasively argues that Dr. Lee's assessment, patient materials, and order are not confirmation that Petitioner *actually received* a flu vaccine. Resp. Brief at 8-9. Dr. Lee's records actually muddy the picture: he assessed Petitioner as needing a flu vaccine on March 1st, but he only *ordered* the vaccine, concurrent with a follow-up telephone call with Petitioner, on March 7th (Ex. 4 at 687).

8

It is also highly relevant that Dr. Lee's order for the flu vaccine was "discontinued." Petitioner argues the "discontinuation" was for *any* flu vaccines, because of his history of GBS. Pet. Supp. Response at 2-3, citing Ex. 4 at 1228. But in support of that proposition, he cites to instructions within a *hospital* record, not the relevant record from Dr. Lee. Moreover, "Accuracy has an extra premium" in medical records which will guide further treatment. *Cucuras*, 993 F.2d at 1528. If Dr. Lee had indeed administered a flu vaccine to Petitioner shortly before his GBS onset, it would have been highly relevant to record that fact. And Dr. Lee could have done so, having been promptly notified of Petitioner's hospitalization (Ex. 4 at 750, 1278). But instead, Dr. Lee's orders for the flu vaccine, Tdap vaccine, and colon cancer screening were *all* discontinued – suggesting that *all three* of those preventative health measures had been refused or deferred by *Petitioner*.

Petitioner has otherwise not filed any evidence that would corroborate his contention that he ever received a flu vaccine, such as an EOB showing a charge for the alleged vaccination (despite my suggestion, ECF No. 24). Neither has he presented any supporting witnesses. And his own testimony is not particularly detailed – and does not explain why he specifically remembered receiving a flu vaccine on March 1st, or why he would have received the flu vaccine in his left arm. *See* Resp. Brief at 8. Indeed, the medical records reflect that Petitioner actually underwent a *PICC line insertion* in his "left upper medial arm," and started receiving IV antibiotics, on March 9th (Ex. 4 at 706), raising the potential that he inadvertently conflated that procedure with the previously-recommended vaccination. That sort of misreporting by a layperson, especially during a hospitalization for unusual and alarming neurological symptoms, would not be uncommon.

I have considered all of Petitioner's later histories to medical providers in which he claimed to have received a flu vaccine. Those histories were likely provided in good faith, and to help guide his evaluation and treatment. But his reports were somewhat delayed (not appearing in the first three days' of medical records regarding GBS), not entirely consistent (especially his first reports that the vaccination occurred on March 7th, and also "two weeks" before March 19th and 20th, *see* Ex. 4 at 1228),[12] and must be viewed alongside the other evidence which is unsupportive of his contentions.

---

[12] Later records – especially the 2021 copy of the state immunization registry newly indicating that Petitioner had received a flu vaccine on March 1, 2017 (Ex. 14) – are entitled to less weight.

9

**Conclusion**

For the foregoing reasons, Petitioner has *not* carried his burden to prove receipt of a flu vaccine on or about March 1, 2017. His claim is therefore ineligible for the Program and must be dismissed. In the absence of a timely-filed motion for either reconsideration or review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.